**In re SLEFCO.**

**SLEFCO, Plaintiff,**

v.

**FIRST NATIONAL BANK OF STUTTGART, Defendant.**

Bankruptcy Nos. AP 88–560, PB 87–518S.

United States Bankruptcy Court,
E.D. Arkansas,
Pine Bluff Division.

Oct. 27, 1989.

Richard Ramsay, Kim Tucker, Pine Bluff, Ark., John Gregg, Batesville, Ark., for debtors.

Baker Kurrus, Little Rock, Ark., for First Nat. Bank of Stuttgart.

Walter Dickinson, Little Rock, Ark., Trustee.

## MEMORANDUM OPINION

MARY D. SCOTT, Bankruptcy Judge.

Now before the Court is an Objection and Counterclaim to the Claim filed by

**630**

First National Bank of Stuttgart ("FNB"). Slefco is an Arkansas general partnership. In addition to the partnership, three of its partners have sought the protection of the bankruptcy court. On June 9, 1987, Carl W. Simpson filed a Chapter 7 bankruptcy case, PB 87–240, and an adversary proceeding against FNB, AP 88–588, was filed by the Trustee on December 27, 1988. On September 4, 1987 Leland and Mildred Simpson filed a Chapter 11 bankruptcy case, PB 87–363, and an adversary proceeding against FNB, AP 88–363, was filed on December 16, 1988. On December 28, 1987 Slefco also filed a Chapter 11 bankruptcy case, PB 87–518, as well as an adversary proceeding against FNB, AP 88–560, which was filed on December 16, 1988. Because the claims and counterclaims in these cases and adversary proceedings are virtually identical, on January 10, 1989, they were, by agreement of all parties and the Chapter 7 trustee, consolidated for trial under Slefco, AP 88–560. The designations Plaintiff, Slefco, and/or debtor throughout this opinion include all Plaintiffs in the consolidated adversary proceedings.

The matter came on for trial January 24–26, 1989. The Plaintiff appeared by its partners and counsel, Richard Ramsay, Esq. and Kimberly Tucker, Esq. The Defendant, First National Bank of Stuttgart, appeared by its executive Vice–President, Cole Martin, and by counsel, Baker Kurrus, Esq. and John Gregg, Esq.

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334. Moreover, the Court finds that it is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(B) and (C) and may enter a final order.

The evidence presented by the parties was substantial and often conflicting. Testimony at trial revealed the following:

First National Bank of Stuttgart is a small bank located in the delta farming region of Arkansas with holdings of approximately $58,000,000.00. Of that amount, $14,000,000.00 is dedicated to agricultural loans with approximately 85% of its other loans being farm related. FNB characterizes its dealings with its custom-ers as "informal" or "casual" due to the size of the bank, the small size of the town, and the fact that the bank deals mainly with farmers. Officers of FNB testified that most of its customers would be classified as unsophisticated borrowers who do not utilize the professional services of accountants. The legal lending limit for FNB is $1,600,000.00.

Leland and Mildred Simpson have been in the farming business for 35 years. In addition to farming, they also own a general store located at Lodge Corner, Arkansas and run a part-time trucking business. The part-time trucking business utilizes the debtor's farm trucks when they are not in use on the farm. When they are used as over-the-road vehicles, they are offered for hire to other farmers to haul grain to storage facilities.

Prior to 1985, the Simpsons obtained their farm financing from the Production Credit Association ("PCA") through its De-Witt, Arkansas office. The Simpsons had both real estate and crop production loans with PCA. Beginning in 1983 and through 1984, problems developed in the Simpson's relationship with PCA. The loan officer at PCA was Waylan Wiggins ("Wiggins"). In 1984, the Simpsons, pursuant to a request from PCA to liquidate some of their land, did sell 525 acres of land. Being dissatisfied with PCA and the loan officer there, however, they transferred their farm financing to the FNB. In January, 1985, the Simpsons borrowed $260,000.00 from FNB to retire their debt to PCA. This initial loan was collateralized by farm equipment. At that time, the loan officer in charge of the FNB agricultural loans was Tommy Gunnell, and he began to handle the Simpson account.

In order for the Simpsons to include their sons, C.W. and Terry, in the farming operation, the Slefco Partnership was formed on March 11, 1985. The partners at the time of formation were Leland Simpson, Mildred Simpson, C.W. Simpson, and Terry Simpson. Leland Simpson was the overall manager of the farming operation and Mildred Simpson kept the books. C.W. and

Terry Simpson did the actual farming of the land.

On March 22, 1985 Slefco borrowed $263,000.00 from FNB and pledged as security all of the partnership's 1985 crops and all of its then existing and thereafter acquired machinery and equipment, including pickup trucks, grain trailers and tractor trucks. Leland and Mildred Simpson also mortgaged 120 acres owned by them and 466.8 acres in which Leland Simpson held a one-half interest. On March 22, 1985 Slefco borrowed an additional $50,000 secured by the same crops and machinery.

On December 17, 1985 Slefco applied to FNB for a loan of $192,334.22 to renew the unpaid portion of its previous carry over loan. Slefco pledged as security its remaining unsold 1985 crops, government deficiency payments, 1986 wheat crop, machinery and equipment. The previously pledged real estate belonging to the individuals was repledged. This renewal note had a maturity date of July 1, 1986. On December 17, 1985 Slefco also borrowed $160,000.00 for the purpose of purchasing new equipment. Slefco again pledged all of its crops and old farm implements and equipment. Leland and Mildred Simpson executed another mortgage on the 120 acres owned by them and on the 466.8 acres in which Leland Simpson had an undivided one-half interest. In late December of 1985 Slefco borrowed an additional $50,000.00 and pledged all 1986 crops now growing or to be grown, as well as again pledging all farm implements and equipment belonging to or after acquired by Slefco.

Finally, on February 19, 1986 Slefco signed a new loan application and promissory note for $650,000.00 for the partnership's 1986 crop production. Slefco pledged as collateral for this loan all 1986 crops, all machinery and equipment then existing and thereafter acquired, Leland and Mildred Simpson's 120 acres and Leland Simpson's one-half interest in 466.8 acres.

By this time in February, 1986 Slefco was farming approximately 4,000 acres. Also, at this time the Simpson's two daughters, Diane Dalton and Rose Wood, were added as partners. Slefco's banking relationship with FNB continued, and the partnership dealt exclusively with bank officer Tommy Gunnell. Gunnell was aware of the Simpson's ownership of the Lodge Corner Store and that they ran a part-time trucking business with the farm trucks. He was also aware that some of Slefco's crop production loan proceeds were used in the part-time trucking business. Each time a loan with FNB was made, Slefco and its partners signed the loan request and promissory note simultaneously. These loans were all approved per the face amount on the various notes, and proceeds were immediately available for use by the partnership.

About the time Slefco finalized its $650,-000.00 crop production loan for the 4,000 acres, Terry Simpson became aware of an opportunity to farm additional land, the Mehaffy farm, which consisted of 618.8 acres of rice land, 219.8 acres of cotton land, and 406 acres of set aside land. Terry Simpson spoke with Tommy Gunnell about this opportunity and the partnership's need for more money for the 1986 crop year if Slefco farmed this land. A few days later, and before signing a contract to farm the Mehaffy land, Terry and Leland Simpson met with Gunnell again about the Mehaffy land. Gunnell informed the Simpsons that by his calculations the land would cash flow if Slefco could obtain a contract on a 75/25 crop share basis. If Slefco could obtain those terms, Gunnell told Slefco it should go ahead and farm the Mehaffy land. Gunnell also told the Simpsons there was no need to rework the Slefco crop production loan at that time. He knew that Slefco, like most of the farming operations, would run out of money under the $650,000.00 loan and would need additional funds to harvest the crops. Gunnell told the Simpsons that they could at that time come back to FNB and include in their request the additional funds needed for the Mehaffy farm. Slefco, based on Gunnell's representations, signed a contract on a 75/25 crop share basis and began farming the Mehaffy land. The partnership utilized funds from the original $650,-

000.00 crop production loan to put in the crops on the Mehaffy land.

On June 15, 1986 Tommy Gunnell left the bank and FNB replaced Gunnell July 1, 1986 with Waylan Wiggins, who formerly worked with PCA. One of the first duties Wiggins undertook for FNB was to review its portfolio of farm loans. Slefco's loan file was part of this review. After reviewing the Slefco file Wiggins sent a Memorandum on July 23, 1986 to the bank President, Neil Maynard, noting the following ten "major deficiencies" in the Slefco loan portfolio.

1. No new partnership agreement for 1986 reflecting the two additional partners.

2. No lien searches reflecting outside debts.

3. Partnership name is Slefco, we have financing statements shown as Selfco and Slefco A Partnership.

4. All financing statements signed as individuals only no partnership signatures.

5. Financing statements filed with Secretary of State and North District of Arkansas County and Jefferson County. Not in Southern District Arkansas County were major portion of crops are growing.

6. No machinery or equipment appraisals in file.

7. Real Estate mortgage on property in Northern and Southern District of Arkansas County and filed only in Northern District.

8. Real Estate mortgage on lands owned jointly with brother (O.W. Simpson) and part of Real Estate mortgage covers lands owned by Arkansas Game & Fish plus part of Real Estate description reflect wrong section number.

9. All notes are signed by individuals only and not by partners.

10. No ASCS Assignments covering 1986 deficiency payments.

This memo also summarized the Slefco loans as follows:

There are four notes to Slefco (two machinery notes in the amounts of $370,-400.00, one collateral note $94,328.00, and one draw note $650,000.00). For a total of $1,111,728.00 plus an individual note to Leland for $58,679.00. All Real Estate, Machinery, and Equipment is owned by individuals. Slefco is at this time requesting additional monies to harvest 1986 crops. Will follow up with complete update of file around 1st of August.

Wiggins, on July 23, 1986, also sent a letter to Slefco notifying the partnership that its carry over loan was past due. Wiggins advised FNB officers that he would attempt to cure the deficiencies in this loan file. He realized that bank procedure at times included recommending renewal of a problem loan to correct documentation deficiencies.

On July 21, 1986, Slefco made its last draw on the $650,000.00 crop production loan. About the same time, Slefco went back to FNB seeking additional financing to finish the 1986 crop year and for the funds for the Mehaffy land they had discussed with Gunnell.

After Slefco requested new money from FNB, Waylan Wiggins inspected the crops and real estate held by Slefco on July 22 and 23, 1986 and asked for a list of anticipated expenses. The inspection according to his notes revealed crops in excellent condition with no mismanagement and the real estate was appraised adequately to back the loans. During this inspection, which included conversations with the partners, Wiggins learned about the Mehaffy land. The loan file, according to Wiggins, contained no information regarding this additional land or Gunnell's agreement with Slefco to loan additional funds to bring in the crops on this land. Slefco advised Wiggins it would need $400,000.00 of new money to cover anticipated expenses to finish out the 1986 crop year for all land it farmed including the Mehaffy land.

At Wiggins' suggestion, all of the Slefco loans were consolidated into two loans with two new notes, one for the equipment at $370,400.00 and another for the crops at

$1,201,000.00. The consolidated equipment loan provided for a lower interest rate than that charged under the previous equipment loans which were not then past due. In addition to preparing notes for the consolidated loans, Wiggins also drafted documents providing pledges of additional collateral from Slefco to FNB, as well as multiple documents to correct the Slefco loan deficiencies.

The additional collateral, by the debtor's account, was valued at $540,000.00 and included the personal guarantees of the two new Slefco partners, Diane Dalton and Rose Wood, assignment of the U.S. Department of Agriculture's Agricultural Stabilization and Conservation Service (ASCS) 1986 payments valued at $160,000.00, the crops growing on the Mehaffy land valued at $317,000.00 before deduction for production costs, $46,378.00 worth of Riceland Food Capital Base Credit and trucks not previously pledged valued at $15,000.00. Wiggins also asked Slefco for an updated list of its accounts payable and directed Slefco to stop writing checks for a while. Mildred Simpson informed Wiggins that the accounts she needed to pay at this time totalled $42,000.00. The bank was also holding approximately $54,000.00 in checks already written by Slefco in anticipation of the new funds being approved.

On July 29, 1986 Wiggins went to the Simpson's farm to have the Slefco partners sign the multiple loan documents, including two promissory notes for $370,400.00 and $1,201,000.00. At this time, Slefco was under the impression the consolidated crop note of $1,201,000.00, which included its request for $400,000.00 of new money, represented a loan approved in that amount. This was so because this was the same procedure that had been followed in their past dealings with FNB. Wiggins also submitted all of the other documents he had prepared for partnership signatures. These documents covered security agreements for the new collateral being pledged as well as the documents Wiggins felt were necessary to correct the Slefco loan deficiencies he had noted in the review of the Slefco loan file.

The FNB discount committee met on August 7, 1986 and Wiggins presented the two Slefco consolidated loans. After much discussion about the Slefco operation, the discount committee approved one of the loans at the face amount, the $370,400.00 equipment loan, but only approved $1,001,-000.00 of the second loan. The discount committee felt the bank could only loan Slefco an additional $200,000.00. The loans were then referred to the full bank Board on these recommendations. Wiggins visited with the Simpsons that same day, and admits that he did not inform them that one of the consolidated loans, which included their request for $400,000.00 of new money, was reduced by $200,000.00 to $1,001,000.00.

On August 12, 1986 FNB took steps to properly perfect liens on Slefco's collateral, both old and newly pledged, paid the past due interest on the old loans to Slefco and paid $54,000.00 in outstanding Slefco checks FNB had been holding. When the full Board met on August 13, 1986 it approved the loans in the amounts recommended by the discount committee. The Board also made a decision to refuse to loan any more money to Slefco during 1986. Neil Maynard, Chairman of the Board, also placed the Slefco loans on the monitor list at the bank until the 1986 crops were harvested.

It is not clear, but sometime between August 13 and 18, 1986, Wiggins informed Leland Simpson that the full Board had not approved the Slefco loan request for $1,201,000.00, but only $1,001,000.00, $200,-000.00 less than requested. Wiggins did not tell Simpson of the Board's decision not to lend any more money to Slefco during 1986. FNB did not submit a new note to Slefco evidencing the finally approved loan amount. The only note in existence is the one Slefco signed for $1,201,000.00. FNB did not offer to release any of the additional collateral it has obtained from Slefco as part of the consolidated loan package Wiggins presented to Slefco on July 29, 1986.

In mid-August, at the height of harvest, Slefco advised Wiggins, pursuant to his request, that the accounts payable for Slef-

co had now reached $192,371.71. On August 26, 1986 Slefco, realizing it was running out of money, approached Wiggins for additional funds from FNB. Wiggins again did not tell the partners of the bank's decision not to loan them any more money in 1986. He told Simpson he could not present a new loan request at that time but would have to wait until he knew the crop yields on the 1986 crops. Slefco partners testified that they were advised by Wiggins to "ride" their trade creditors until then. At this time, Wiggins also wrote in his Slefco loan file notes, "this operation has no survivability." During August, FNB refused to honor a check from Slefco to Riverside Terra for about $35,000.00, but later honored the check. In September, FNB also refused to honor a Slefco check for $3,500.00. Again, that check was ultimately honored. Both times, Slefco had funds in the account. Slefco accounts were only being paid after Slefco submitted invoices to Wiggins and after he approved payment.

On September 24, 1986 Slefco presented to FNB through Wiggins yet another loan request for an additional $250,000.00. Wiggins took the request to the FNB Board on October 8, 1986. The request was refused. On October 23, 1986 Slefco thought it made its last draw on the new consolidated crop loan. However, there was apparently $30,000.00 left in the account. To compound Slefco's problems the harvested crops were yielding less than projected which caused the partnership more financial difficulties.

Again, in December, 1986 Slefco approached the bank with yet another new loan request and this request was also refused. Slefco, however, did sign an extension agreement of the crop loan. FNB still had not changed the face amount of the note to reflect the actual loan amount approved by the bank, namely, $1,001,000.00. About that time, FNB documents and notes indicate FNB felt liquidation was the only alternative for Slefco. At the end of harvest Slefco owed approximately $207,000.00 to trade creditors. These creditors now make up Slefco's unsecured creditors listed on the bankruptcy petition.

In March of 1987 Slefco, in an attempt to work out of its problems, met with Cato Corporation farm advisors to see if Slefco could restructure its farm loans. Ms. Ida Hurley of Cato met with Waylan Wiggins and Cole Martin on March 9, 1987 to discuss the Cato proposal for Slefco. The bank refused to accept the proposal due to the length of the refinancing which was thirty years for the real estate and seven years for the machinery and equipment. The bank also felt this proposal would not cash flow properly.

Slefco advertised and held an auction on April 14, 1987 selling most of its machinery and equipment to help satisfy the outstanding loans due FNB. However, Slefco was still in a financial crisis; its loans with FNB were past due and the partnership was unable to obtain financing from any other source for the 1987 crop production year. FNB filed a complaint in state court against Slefco initiating foreclosure proceedings May 14, 1987. The remainder of 1987 FNB closely monitored the sale of the Slefco 1986 crops and collected as much as it could on the liquidation of the collateral securing the Slefco loans.

On June 9, 1987, Carl W. Simpson filed a Chapter 7 bankruptcy. On September 4, 1987, Leland and Mildred Simpson filed a Chapter 11 bankruptcy and finally on December 28, 1987 Slefco filed a Chapter 11 bankruptcy.

The debtor has filed an Objection to the claim of FNB and filed a Counterclaim against the bank as follows.

1. The debtor denies that it is indebted to the First National either on a secured or unsecured basis.

2. The debtor admits the execution of the documents marked as Exhibits A through G to First National's Proof of Claim, but affirmatively states that the claim of First National should be denied due to fraudulent misrepresentations, constructive fraud and breach of duty and good faith and fair dealing by First National and due to the fact that the loan as contemplated in Exhibits A through G and upon which First National's Proof of

Claim is based was not made and, therefore, Exhibits A through G are of no effect; in the alternative the debtor affirmatively states that the claim of First National has been discharged due to a material alteration of the promissory note attached as Exhibit A to First National's Proof of Claim. The debtor further states that the claim of First National is subject to a set-off which is the subject of debtor's counterclaim set forth below and incorporated herein by this reference; or in the alternative that the claim of First National should be subordinated to the unsecured creditors. The basis for each of the above grounds for objection are more fully set forth in debtor's counterclaim set forth below and incorporated herein.

3. The debtor specifically denies that the claim filed by First National is not subject to any set-off or counterclaim. WHEREFORE, the debtor-in-possession, Slefco, prays that the claim of First National be denied.

## COUNTERCLAIM

Comes the debtor-in-possession, Slefco, and for its counterclaim to the claim filed by First National Bank in Stuttgart states:

1. Slefco is a partnership organized and existing under the laws of the State of Arkansas, and is the debtor in the Chapter 11 case pending herein. Slefco's principal place of business is in Arkansas County, Arkansas.

2. First National Bank in Stuttgart is a national banking association organized under and by virtue of the laws of the United States of America with its principal place of business in Stuttgart, Arkansas County, Arkansas.

3. This counterclaim is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(C).

## COUNT I

### FRAUDULENT MISREPRESENTATION AND CONSTRUCTIVE FRAUD

4. In January of 1986, the debtor-in-possession, Slefco, and its partners, applied for and were granted a crop loan for the 1986 crop year in the amount of $650,-000.00 from First National. Thereafter, in April of 1986, additional acreage became available that the partnership desired to lease. Before leasing the property and in order to lease such land, the partners discussed the need for a larger crop loan with a representative of First National. The partners were assured that the loan would be made when needed. With this assurance from First National, Slefco leased the additional land.

5. In July of 1986, the partners approached First National for the promised additional funds. The first loan officer has since resigned from First National. They discussed the loan with another First National loan officer, Waylan Wiggins. Mr. Wiggins unilaterally determined to consolidate the January loan and four other loans which were all current into two notes as a condition to the loan of the additional funds as promised.

6. On July 29, 1986, Slefco and each partner, individually, executed a promissory note in the amount of $1,201,000.00. A copy of such note is attached as Exhibit A First National's proof of claim filed herein. In order to secure this note, Slefco executed a security agreement granting First National a security interest in collateral not previously held by First National, and Leland and Mildred Simpson executed a mortgage on real property. The security agreements and mortgage form, in part, the basis of the motions for relief from stay filed in both the Slefco case and the Mildred and Leland Simpson case. However, the contemplated loan was never made and funds were not disbursed as agreed, and available funds were frozen, causing checks drawn on the partnership to bounce. When the partners discussed the loan with First National, First National's loan officer stated that First National had made a loan in the amount of $1,001,000.00, but assured the partners that if the partnership would harvest the corn the additional funds would be made available. The loan made by First Na-

tional in the principal amount of $1,001,-000.00 was not documented and no note, security agreement and/or mortgage exist on this loan. At the time the representative of First National informed the partners that the intended loan of $1,201,000.00 would not be made, the loan officer urged the partners to "ride" their trade creditors until the crops were harvested. The loan officer assured the partners that additional funds would be forthcoming to pay these trade creditors once the crops were harvested.

7. The actions and assurances of First National with regard to the loan to Slefco constituted fraudulent misrepresentations and constructive fraud and the partners were fraudulently induced to execute the security agreements and mortgages attached to First National's motion for relief from stay. As a result of the actions of First National, the loan documents attached to First National's motion for relief from stay should be voided and Slefco and its partners are entitled to punitive damages.

## COUNT II

### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

8. These counterclaimants adopt and reallege each and every material allegation contained in Paragraphs 1 through 7 of the counterclaim.

9. The actions of First National in inducing the debtor and counterclaimant to consolidate the loans and First National's actions thereafter with respect to the debtor and counterclaimant constituted a breach of good faith and fair dealing and a breach of the fiduciary duty it owed to the debtor and counterclaimant.

10. As a result of First National's actions Slefco is entitled to discharge of the claim of First National and to compensatory damages in an amount to be determined at trial.

## COUNT III

### OBJECTION TO CLAIM AND RECOVERY OF PREFERENTIAL TRANSFER

11. The debtor counterclaimant adopts and realleges each and every material allegation contained in Paragraphs 1 through 10 of the counterclaim.

12. The claim of First National is based upon a certain promissory note attached as Exhibit A thereto in the principal amount of $1,201,000.00. The mortgage and security agreement attached as Exhibits D and E, respectively, to First National's motion for relief from stay were executed by the counterclaimants and intended to provide security for a loan in the amount of $1,201,000.00.

13. The loan evidence by the promissory note and intended to be secured by the mortgage and security agreement was not made. Instead, First National unilaterally determined to make a loan in the amount of $1,001,000.00 and, in fact, disbursed loan proceeds on that loan to pay off prior indebtedness to First National without informing the counterclaimants or documenting such loan. No mortgage or security agreement exists securing the loan actually made by First National.

14. The secured claim asserted by First National should be denied inasmuch as the alleged security interest was never taken, and, pursuant to 11 U.S.C. § 547(b), all payments received by First National within one year prior to the filing of the petition herein should be recovered by the debtor-in-possession inasmuch as such payments were made to or for the benefit of a creditor on or account of an antecedent debt at a time which the partnership was insolvent and enabled the creditor to receive more than it would have if the case under Chapter 7 at the time the payments were made.

## COUNT IV

### MATERIAL ALTERATION DISCHARGE OF CLAIM

15. The debtor and counterclaimant adopts and realleges each and every material allegation contained in Paragraphs 1 through 14 of the counterclaim.

16. As an alternative to Count III herein, if the Court finds that the loan was

evidenced by the note described in Paragraph 11 herein, evidences the claim of First National, the note was materially and fraudulently altered by representative of First National by the placement of the notation thereon as shown by a copy of the promissory note attached hereto as Exhibit A.

17. Pursuant to ACA Section 4–3–407, such material and fraudulent alteration discharges all parties thereto.

## COUNT V

### EQUITABLE SUBORDINATION

18. The debtor and counterclaimant adopts and realleges each and every material allegation contained in Paragraphs 1 through 17 of their counterclaim.

19. As an alternative to Counts III and IV herein, if the Court finds that First National has a valid claim and that such claim was not discharged, the claim of First National should be subordinated to those of the debtor's unsecured creditors.

20. First National, after refusing to extend the promised financing, continued to urge the partners of Slefco to harvest the 1986 crops and represented that once the crops were harvested and proceeds paid to First National, the outstanding indebtedness would be refinanced. During the at time, First National urged Slefco and its partners to "ride its (unsecured) trade creditors" in order to harvest the crops and represented that once the crops were harvested these unsecured creditors would be paid with the refinancing. However, no such refinancing occurred.

21. The actions of First National in causing Slefco and its partners to incur unsecured debt should cause any claims of First National to be subordinated to the claims of the unsecured trade creditors.

## COUNT VI

### USURY

22. The debtor and counterclaimant adopts and realleges each and every material allegation contained in Paragraphs 1 through 21 of its counterclaim.

23. The promissory note executed by the debtor provides that interest at the rate of 11 percent will be paid from that date of July 29, 1986, on $1,201,000.00. In the event that the court finds that the actual loan made to the debtor was in the reduced amount of $1,001,000.00 the note is usurious on its face. Article 19, Section 13 of the Constitution of Arkansas provides that the rate of interest for contracts in which no interest is agreed shall be six percent per annum. In the event that the Court finds that the actual contract between the parties was for $1,001,000.00 no rate of interest was agreed upon on such loan and, therefore, the maximum rate of interest which could be charged by First National was six percent.

24. The debtor should recover twice the amount of interest paid to First National and in the event the Court finds a valid contract between the parties the rate of interest in excess of six percent should be voided.

25. The debtor and counterclaimant hereby reserves the right to plead further herein by amendment or other appropriate pleading.

The debtor and counterclaimant seeks to have FNB's claim denied, judgment against First National for all sums due it as a result of First National's actions, punitive damages in the sum of $3,600,000.00 as a result of First National's fraudulent misrepresentations and constructive fraud, compensatory damages to be determined at trial, that the claim of First National be declared void or denied or alternatively, that the Court find that such claim has been discharged, or, that any claims of First National be subordinated to the claims of the unsecured creditors, recovery of usurious interest paid to First National, and recovery of the counterclaimant's costs.

First National Bank, in its reply to the counterclaim filed on behalf of Slefco, stated as follows:

1. The allegations contained in paragraph 1 of the counterclaim are admitted.

2. The allegations contained in paragraph 2 of the counterclaim are admitted.

3. The allegations contained in paragraph 3 of the counterclaim are admitted.

4. FNB admits that Slefco received a loan in the amount of $650,000.00 from FNB. FNB denies all remaining allegations contained in paragraph 4 of the counterclaim.

5. FNB admits that Slefco requested an additional loan and admits that the additional loan was discussed with Waylan Wiggins. FNB denies that Mr. Wiggins unilaterally took any actions and further denies that the loans in question were current. All remaining allegations contained in paragraph 5 of the counterclaim are denied.

6. FNB admits that Slefco and each of its partners executed the promissory note and other documents attached as exhibits to the FNB proof of claim filed herein. FNB denies that the contemplated loan was never made and denies all remaining allegations contained in paragraph 6 of the counterclaim. Answering further, FNB states that Slefco applied for a loan in the amount of $1,201,000.00 but was approved for a loan in the amount of $1,001,000.00. Slefco was promptly advised of the approval in the amount of $1,001,000.00 and Slefco thereafter made requests for advances under this loan with full knowledge of the fact that the loan was in the amount of $1,001,000.00. Because of the dire financial condition of Slefco and the fact that it had outstanding checks in excess of its balances at the time of loan approval, a new note was not executed. The circulation for execution of such a new note would have required further delays due to the fact that Slefco's partners were not immediately available to execute any new note. Slefco, through its partners, was aware of the fact that its loan was in the amount of $1,001,-000.00 and acquiesced to this loan amount.

7. The allegations contained in paragraph 7 of the counterclaim are denied.

8. The allegations contained in paragraph 8 of the counterclaim are denied.

9. The allegations contained in paragraph 9 of the counterclaim are denied. Answering further, FNB denies that it breached any duties of any kind and asserts that it acted at all times in good faith and dealt fairly with Slefco.

10. The allegations contained in paragraph 10 of the counterclaim are denied.

11. For the reasons stated previously, the repetitive allegations contained in paragraphs 11, 12, and 13 of the counterclaim are denied. The loan in question, in the amount of $1,001,000.00 was approved by FNB and accepted and drawn by Slefco. Although Slefco applied for a loan in the amount of $1,201,000.00, the loan was only approved in the amount of $1,001,000.00. Slefco was advised upon the approval of the loan and thereafter made draws under the $1,001,000.00 loan. Although revised loan documents were not executed because of the time constraints involved and the immediate need by Slefco of the loan funds which were approved, Slefco was fully advised of the amount of its loan and acquiesced in this by making draws thereunder. The counterclaim does not contain any essential allegations for a cause pursuant to 11 U.S.C.A. § 547. To the extent that the counterclaim contains factual allegations in support of such a claim, the allegations are denied, and all remaining allegations contained in paragraph 14 of the counterclaim are denied.

12. The allegations contained in paragraph 15 of the counterclaim are denied.

13. Although the pleading served upon FNB fails to contain the exhibit which shows that "The note was materially and fraudulently altered by representatives of First National," FNB denies any material and fraudulent alternation and further denies that any notation placed on the promissory note which evidences the loan to Slefco discharges Slefco or its partners. Although Slefco applied for a

loan in the amount of $1,201,000.00, Slefco was advised that this application did not constitute a loan in the amount of $1,201,000.00 and was further advised after the appropriate loan committees convened that the Slefco loan had been approved only in the amount of $1,001,000.00. Therefore, Slefco acquiesced in and accepted the loan in this amount by making draw requests under the loan as approved. Slefco was fully advised of the amount of its loan and FNB engaged in no fraudulent conduct of any kind. The allegations contained in paragraph 16 are therefore denied.

14. The allegations contained in paragraph 17 of the counterclaim are denied.

15. The allegations contained in paragraph 18 of the counterclaim are denied.

16. The allegations contained in paragraph 19 of the counterclaim are denied.

17. The allegations contained in paragraph 20 of the counterclaim are denied.

18. The allegations contained in paragraph 21 of the counterclaim are denied.

19. The allegations contained in paragraph 22 of the counterclaim are denied.

20. The allegations contained in paragraph 23 of the counterclaim are denied.

21. Although the promissory note executed by Slefco shows the amount of $1,201,000.00, Slefco was advised after the appropriate committee meetings that the loan was approved only in the amount of $1,001,000.00. Slefco was never charged interest on any funds which were not advanced and was only charged interest at a lawful rate on funds advanced during the time which they were outstanding. No usurious interest was charged or collected and no usury exists in this transaction. The allegations contained in paragraph 23 are therefore denied.

22. The allegations contained in paragraph 24 of the counterclaim are denied.

23. The allegations contained in paragraph 25, to the extent they attempt to vary the terms of the applicable bankruptcy rules, are denied.

24. All allegations not specifically admitted are denied.

### AFFIRMATIVE DEFENSES

25. After the Slefco loan was approved in the amount of $1,001,000.00 rather than in the amount requested of $1,201,000.00, Slefco made draws under the loan in the amount of $1,001,000.00 without reserving any rights or without any objections whatsoever. Slefco, through its partners, took funds which were drawn under the Slefco note and misapplied these funds to other projects, including a trucking company, thereby leaving Slefco with insufficient funds to conduct its business. Slefco, in its loan application, substantially understated its liabilities to its creditors. Slefco did not, in fact, draw all funds available to it under its loan from FNB. Any claim by Slefco or its partners that it failed to have sufficient funds with which to complete its operations is barred because this claim was caused by Slefco's own fraudulent misrepresentations, constructive fraud, and misapplication of funds. Based upon these facts, FNB pleads the affirmative defenses of waiver, estoppel, laches, unclean hands, and compromise and settlement.

First National Bank seeks to have its original proof of claim allowed as filed, that the counterclaim against it be dismissed, that it be awarded all of its costs expended as well as reasonable attorney's fee, and all other just, proper and equitable relief.

Summarizing these pleadings, then, the debtor seeks under various theories either to have the FNB claim disallowed in full or, if any part of the FNB claim is allowed, that it be subordinated to the claims of all other creditors. Slefco also seeks to recover any funds paid to FNB within the year preceding the filing of the Slefco bankruptcy petition as preferential payments. This request is, according to the debtor, based upon the assumption that the Court declares part or all of the debt to FNB to be unsecured. The debtor also seeks punitive damages.

FNB argues that there was no contract or commitment to loan money to allow Slef-

co to farm additional property, that its actions throughout its transactions with the debtor do not constitute fraudulent misrepresentation, constructive fraud or bad faith, that there was no material alteration of the operating loan note and, even if one occurred, it was waived by Slefco. FNB also contends that it did not receive a preference and no grounds exist for subordination of its claim to the unsecured creditors. FNB also asserts that even if Slefco's claims were substantiated, Slefco suffered no damages and hence, is not entitled to any recovery.

Initially, the Court notes that Slefco's allegation regarding usury was dismissed at the completion of the Plaintiff's case, there being no evidence to support this assertion. The remaining issues before the Court then are whether the actions of FNB with regard to Slefco constitute (a) fraudulent misrepresentation, constructive fraud or bad faith, (b) a material alteration of the Slefco operating loan note, (c) avoidable preferences, and/or (d) grounds for equitably subordinating the FNB debt to the claims of the Slefco unsecured creditors. Upon resolving these questions the Court must then decide whether damages are warranted and, if so, in what amount.

The parties have submitted lengthy post-trial briefs. Although their organization and definition of the issues outlined by the Court above is not exactly identical, the Court believes it can decide all the issues by utilizing FNB's outline.

■ FNB argues that there was no contract or commitment to loan money to allow Slefco to farm the Mehaffy property. It contends that the statements of its loan officer, Tommy Gunnell to Slefco partner, Terry Simpson, did not amount to an oral commitment and therefore there was no contract which could be breached which in turn could give rise to damages.

Typically, cases which present this issue to the courts involve an allegation by a borrower that a bank agreed to make a loan for a certain amount, then failed to honor that agreement. Generally, there is *no* written document to evidence any agreement, and the borrower cries foul be-

cause he acted to his detriment in anticipation of receiving the promised loan. In some situations there may be a written document revealing that a loan was made in a lesser amount than the amount the borrower believed he was to receive per the oral agreement. Under the latter scenario, borrowers' counterclaims for breach of a contract to loan money have generally been unsuccessful because courts have held that all preliminary negotiations leading up to a written contract are merged into it when executed. *Farmers Cooperative Assn., Inc. v. Garrison*, 248 Ark. 948, 952, 454 S.W.2d 644, 646 (1970); *Standard Rice Co. v. Dilday*, 191 Ark. 754, 548, 87 S.W.2d 588, 591 (1935); *Pyramid Life Insurance Co. v. Belmont*, 177 Ark. 564, 575, 7 S.W.2d 32, 36 (1928). See *Restatement (Second) of Contracts*, 209(1) and § 213(1) (1981). See also 17A C.J.S. *Contracts*, § 381, at 445–48.

The facts presented in this case are atypical. Here the debtor contends that the bank made an oral commitment to loan it sufficient additional funds to complete its 1986 crop year which included all its original acreage plus the additional 1,200 acres it had taken on after the crop year began. The debtor states $400,000.00 of additional money was needed. The bank states it made no such promise or oral commitment. The written document, i.e., the note evidencing the agreement of the parties, however, matches the debtor's version.

What ultimately happened, of course, was that the written document upon which the debtor asserts it relied was not, according to FNB, the final agreement of the parties. Instead, the bank contends that "revised loan documents," presumably reflecting the real final agreement, were never executed because of time constraints and the debtor's immediate need for loan proceeds.

The court finds this account incredible. If one is to accept the bank's argument and its version of the facts, there is, at this point, no other conclusion to be drawn than that there is no written document evidencing the agreement. The bank, however, filed a foreclosure action in state court

seeking to foreclose mortgages securing a note for an amount it says it neither informally nor formally agreed to lend the debtor. Yet, the note, which the bank now claims is not evidence of its agreement with the debtor, is attached not only to its Complaint in state court but, to its Proof of Claim filed in the bankruptcy proceedings. FNB argues that it can rely on this note because it reflects a "line of credit" which, for various business reasons, was cut off before the full amount was borrowed. But it also insists that the loan committee and Board of Directors never agreed to loan the debtor the face amount of the note. The two arguments cannot be reconciled.

■ FNB contends that none of its actions throughout the transactions surrounding the loan consolidations constitute fraudulent misrepresentation, constructive fraud or bad faith. The debtor asserts and the Court agrees that the bank's first misrepresentation occurred when the bank, through Wiggins, initiated the idea of consolidating the partnership loans, prepared and had the Simpsons execute notes, mortgages, security agreements, as well as all other supporting documents reflecting two loans, one for $370,400.00 and one for $1,201,000.00. Slefco contends the bank never intended to loan them the full amount under the $1,201,000.00 crop loan.

FNB argues that the backward chronology of events, i.e. execution of all loan documents and perfection of security agreements prior to loan approval, generally occurred in farm loans. All the evidence presented, however, contradicts this bald assertion. The debtor had a multiple loan transaction history with this bank which does not support the bank's contention. All activities surrounding the debtor's prior loans followed the exact pattern as the ones under scrutiny. The bank could offer no evidence that it had handled any other loan for any other borrower, farm or otherwise, in this fashion.

FNB relies on the testimony of Wiggins and its president, Neil Maynard, to support its argument that it did not misrepresent its intentions during this transaction with the debtor. The Court finds that neither witness presented a demeanor consistent with truthfulness. The Court finds that FNB knew the debtor's financial position was very questionable and set about a course of conduct that would lead this borrower to execute those documents which would correct major deficiencies in its loan file as well as substantially enhance the bank's deficient security position. The bank's own policy manual spelled out for Wiggins his course of conduct; the bank may have to renew the loan to correct deficiencies.

Wiggins knew what would motivate the debtor to give him the corrections and additions the bank needed. The debtor had presented to him an estimate of the new funds immediately needed as well as funds needed in the near future to complete the 1986 crop year, approximately $400,000.00. The evidence ultimately proved the debtor's estimates to be correct. The $200,000.00 of new money was, but for approximately $30,000.00, used and the trade creditors the debtor was encouraged to "ride" are now owed some $207,000.00. The total is approximately $400,000.00.

The bank asserts that the debtor's own conduct caused its financial problems because it grossly underestimated accounts payable in July, and when it presented an updated account in late August for almost $200,000.00 the bank justifiably became alarmed. FNB says these "massive delinquent debts" were unknown to it when the consolidated loans were considered in July and early August. Mildred Simpson's explanation, however, makes sense and rings of the truth. The accounts payable list she gave Waylan Wiggins in July contained the accounts that needed to be paid then. The full accounting, or the amount Slefco needed to finish the crop season for all the lands including the Mehaffy property, was $400,000.00 and they had given this figure to Wiggins. Mildred Simpson testified that the bulk of the debt for harvest would come in at the end of August and, that is exactly what happened. The Court believes the bank's alarm is a hindsight reaction and an attempt to justify its subsequent actions.

■ The Court also finds that the bank's course of conduct after the initial misrepresentation regarding the amount of money the bank intended to loan in exchange for the debtor's agreement and pledge of old and new collateral amounted to a further misrepresentation, namely, that additional funds would be forthcoming. The Court was again faced with conflicting testimony and again it does not find the bank's witnesses credible. The debtor at this time was expending all its energies getting the crops harvested, all to the advantage of the bank. The debtor's prior relationship with the bank (and apparently it is the "informal" relationship most farmers have with their banks according to all witnesses including the debtor's expert) understandably led them to conclude that as soon as the work was accomplished they would ultimately get with the bank and accounts would be set straight. Gunnell testified that the bank knew that farmers generally run out of funds toward the end of the season and have to request supplements to the crop production loans and that is what he told the debtor the bank would do in its case. FNB, according to its own records as early as July, 1986, had changed loan officers, however, and had no intention of continuing with this debtor. The bank never communicated this decision to the debtor.

The Court agrees with the debtor's contentions that FNB, through Wiggins, misrepresented the debtor's future borrowing capabilities with the bank in order to keep the partners in the fields to get the bank's collateral harvested. Wiggins admitted he was afraid that the debtor might abandon the crops.

■ FNB argues that Slefco cannot, in any event, now complain because it never took any action to disaffirm what it ultimately found out to be the true amount of its operating loan. FNB also argues that Slefco accepted the benefits of the loan in the lesser amount and drew funds from the new money ultimately approved and even made repayments. FNB asserts that the debtor, under the circumstances, has waived its right to assert fraud citing *Her-*

*rick v. Robinson,* 267 Ark. 576, 595 S.W.2d 637 (1980). But the bank, as it does throughout most of its argument, focuses on particular events and ignores the overall picture.

The bank's misrepresentations to the debtor began with Wiggins' concerted effort to correct FNB's loan file deficiencies and shore up its secured position. In order to reach its ultimate goal of repayment of the loan, the misrepresentations continued to keep this borrower in the fields tending the bank's collateral. This course of conduct was based upon the bank's hidden agenda which was thoroughly spelled out in its internal loan file memoranda and board minutes, but never explained that to the debtor. The bank took advantage of its "informal" or "casual" relationship with this unsophisticated borrower. Recovery for these misrepresentations is warranted, which will be discussed *infra.* Before reaching that discussion, however, the Court will continue with the issues as presented under the outline it is following.

■ The parties also dispute whether there was a material alteration of the operating loan note of the type which would discharge the debt owed by Slefco. The debtor relies on Section 3–407 of the Uniform Commercial Code (Ark.Code Ann. 4–3–407), which provides at (2)(a) that alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby damaged. Both parties point out correctly that the alleged alteration must be both material and fraudulent.

The alleged alteration of the operating loan note took the form of a memo affixed to the note advising that the loan limit was less than the face amount of the note. The note itself was not altered other than this affixed (stapled) memo which provided as follows:

"do not make any advances without the approval of Waylan Wiggins. Also, freeze the amount of $202,537.34 on this note. Max draw $998,462.66."

Any party whose contract is changed by the alteration of a note is discharged from his obligation under the note if he can show that the alteration (1) was made by the

holder of the note, (2) was material, and (3) was made for a fraudulent purpose. To show fraud the party seeking discharge must show that the holder altered the instrument with a deceitful purpose. *Citizens National Bank of Willmar v. Taylor*, 41 U.C.C.Rep.Serv. 516, 368 N.W.2d 913 (Minn.1985).

The Court has reviewed the relatively few cases which interpret this provision of the Uniform Commercial Code. They are not very helpful in that there really is no fact situation similar to the case before the Court. What is apparent though, after reading the cases, is that this section of the Uniform Commercial Code should be strictly construed due to the drastic remedy provided if the section is violated.

The facts in this case, as earlier noted, are atypical. The bank never "altered" the note but attached what the parties have referred to as a "limiting memorandum." The fact is, however, that there is no note reflecting the final loan amount approved by the bank. The note is for an amount in excess of the amount finally approved by FNB. The bank attempts to characterize this note as a "line of credit" note which, in the way it was handled, is probably a correct characterization. But, as earlier noted, the cap or the credit level, beyond which the debtor could not draw, was not the figure on the face of the note but a lesser amount. The facts in this case do not reflect a "freeze" of a line of credit before the debtor reached the face amount of the note. Rather, the "limiting memorandum" on the note reflects the cap on the final loan approved.

The Court notes again, as it did during the above discussion of the original consolidated loan transactions, that it is the atypical nature of the facts which is making it difficult, if not impossible, to apply the facts to the law. Even though this difficulty does exist the Court does agree with the bank that the debtor, at least by August 13–18, knew of the limitation and continued to operate under it, albeit not well and to the great detriment of the partnership's unsecured creditors. Hence, the Court cannot conclude that the drastic remedy of discharge of the debtor's entire obligation to the bank is appropriate.

The debtor also argues, in the event the Court determines that any or all of the FNB is unsecured or bars the claim of FNB, it is entitled to recovery of $297,633.93 in preferential payments made to FNB within the year preceding the filing of the Slefco bankruptcy case. The Court finds that this allegation was not sufficiently developed at trial to permit any recovery.

Lastly, Slefco asserts that the claim of FNB should be subordinated to the claims of its other creditors and relies on 11 U.S.C. § 510(c) which provides that the court may

1) under principles of equitable subordination, subordinate for purposes of distribution all or any part of an allowed claim to all or part of another allowed interest; or

2) order that any lien securing such a subordinated claim be transferred to the estate.

According to legislative history and under existing case law, a claim is generally subordinated only if the holder of such claim is guilty of inequitable conduct, and the misconduct has resulted in injury to creditors of the debtor or conferred an unfair advantage on the claimant. *Wegner v. Grunewaldt*, 821 F.2d 1317, 1323 (8th Cir.1987), *In Re Baugh*, 73 B.R. 414, 417 (Bkrtcy.E.D. Ark.1987). The fact that such a claim is secured is of no consequence to the issue of subordination. See 3 *Collier on Bankruptcy*, para. 510–02 [15th ed. 1986] which provides as follows:

> Allowance and subordination are judicial acts. The court sits as a court of equity in passing on an allowance of claims. When a claim has no basis in law, is nonexistent or illegal, the claim should be disallowed. If a creditor's misconduct has been directed toward the debtor, the creditor's claim is either invalid or else it is barred by a valid defense of the debtor. In such a case, the claim of the creditor is disallowed. Section 502 of the Code states the bases for disallowance and includes, under subsection (d), provisions for disallowance of the claims of "dirty hands" transferees. There are

times, however, when a claim is valid but the claimant has been guilty of misconduct which requires an equitable remedy. In such a case, the valid claim may not be disallowed but will be subordinated or postponed in rank until the claims of the other creditors have been satisfied.

Subordination is an equitable remedy in which the order of payment rather than the existence of the debt is in issue. If recognized principles of equity have been violated by the claimant, the court has the power, under section 510(c) of the Code, to subordinate or postpone his claim. Whereas the issue in disallowance may be whether the claimant has directed his harmful conduct toward the debtor, the issue in subordination is whether such conduct was directed at other creditors. If it was, the claim which is otherwise provable and allowable should be postponed until the claims of the creditors, who were harmed, have been satisfied. This remedy is a compromise between allowance and disallowance and is usually, in effect, a mode of general disallowance which was judicially created but is now incorporated into section 510 of the Code.

■ All or part of a claim may be subordinated to all or part of another claim. Thus, depending on the circumstances, a subordinated claim "may be relegated to the bottommost rung of claims or may be simply allowed after rather than ahead of the claim of a party who has in some way been injured by the conduct of the holder of a subordinated claim." 3 *Collier on Bankruptcy*, para. 510.05[1] (15th ed. 1986). See also *Benjamin v. Diamond, (In Re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir.1977) wherein the Court of Appeals stated that claims should only be subordinated to the extént necessary to offset the injury to the debtor and its creditors. Under section 510(c)(2), when a claim that is subordinated is secured by a lien, the lien is transferred to the debtor's estate under section 541, i.e., the subordinated claim becomes unsecured and the property securing such claim becomes part of the debtor's estate.

FNB contends that the Slefco and Leland and Mildred Simpson have no standing to assert a claim for subordination. FNB does not argue that the Trustee in the C.W. Simpson case has no standing but asserts that he has "apparently not actively pursued the claim." This is an inaccurate assessment. The Trustee filed a separate adversary proceeding seeking equitable subordination and agreed to have his action consolidated for trial. Hence, the Trustee's case is in fact actively being pursued.

■ The Court earlier spent considerable time outlining what it finds to be the misrepresentations of FNB. These misrepresentations led the debtor to pledge all its remaining assets to FNB and "ride" its trade creditors resulting in approximately $207,000.00 in unpaid unsecured debt. Since the debtor now has no unencumbered assets there remains no feasible way for these claimants to be paid. The Court finds that FNB's actions in its dealings with the debtor was inequitable conduct which resulted in injury to other creditors.

■ What remains is the issue of what damages, if any, are warranted under the findings of the Court. On one side there is a debtor with no future by everyone's account. Even its own expert witness testified that FNB should never have made the first loan and the debtor was hopelessly insolvent. On the other side there is a bank asserting that it acted in accordance with its duty to its shareholders, pursued that duty with great diligence and without regard to any responsibility it might have to its borrower. Presumably the bank cannot envision a situation where it could fulfill its responsibilities to both. In the middle there are the trade creditors, the unsecured debt and the administrative claims incurred in these bankruptcy proceedings. The unsecured creditors were unaware of the debtor's precarious financial situation. The debtor, unaware of the bank's hidden agenda, pledged all of its remaining unencumbered assets to the bank and now has no way to pay the unsecured debts and the administrative claims in these bankruptcy proceedings. These administrative claims have been incurred as a result of the efforts to recover funds sufficient to pay the unsecured claims.

Under the circumstances, the Court determines that FNB's claim should be subor-

dinated not only to the claims of these creditors, but any administrative costs incurred pursuant to the recovery of funds sufficient to pay these claims. Any lien obtained by FNB by virtue of its inequitable conduct is transferred to the estate until all other claims per this opinion are satisfied in full.

The Court has reached this determination after considering all the debtor's alternative remedies as well as its request for punitive damages. The Court is aware that the award of punitive damages can at times serve to deter inequitable conduct of the type engaged in by this bank. However, a determination that the bank must go to the bottommost rung before its claim is to be paid can also serve as a sufficient deterrent to any others who might engage in similar conduct.

A party seeking damages has the burden of proving the claim, not just a right to the claim. If no proof is presented to the trial court that would allow it to fix damages in dollars and cents the court cannot award damages. Likewise, if actual damages cannot be awarded, neither can punitive damages which must bear some reasonable proportion to actual damages shown. *Winkle v. Grand National Bank*, 267 Ark. 123, 601 S.W.2d 559 (1980); *Mason v. Russenberger*, 260 Ark. 561, 542 S.W.2d 745 (1976); and *Tolbert v. Samuels*, 229 Ark. 676, 317 S.W.2d 715 (1958). Evidence of actual damages sustained by the debtor was speculative, inconclusive and/or unreliable.

The debtor does not argue, nor would the evidence support such an argument, that but for the bank's inequitable conduct, the farming operation would not have failed. It would be difficult to conclude, under the evidence before the Court, that the debtor was injured. Rather, what occurred was great injury to the unsuspecting trade creditors. The bank knew it had taken all the debtor's available unpledged assets and knew the debtor was running up unsecured debt. The bank, simply stated, had an unfair advantage over these creditors. It knew the debtor had "no survivability" and knew it would lend the debtor no additional funds. If the bank did not know, it should have known that the trade creditors would

be irreparably injured. Under the circumstances, the equitable remedy of subordination is consistent with bankruptcy laws and particularly appropriate in these circumstances. The bank clearly placed its right to be repaid before the other creditors. Given the bank's unique knowledge of the debtor's poor financial condition, it clearly violated rules of fair play and good conscience. It used information not available to other creditors to gain an unfair advantage.

Accordingly, for the foregoing reasons, it is hereby

ORDERED that the claim of First National Bank of Stuttgart be subordinated to other claims in these bankruptcy proceedings per the findings of the Court in this Memorandum Opinion. It is further

ORDERED that any lien securing such subordinated claim be transferred to the bankruptcy estate until other claims are paid in full.

IT IS SO ORDERED.